AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
NOV 1 5 2019
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )     Case No.  **19MJ5112**
Samsung Galaxy Note 8 Cellular Telephone stored as )
ATF evidence item #08 )
 )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2.

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. s. 841; 18 U.S.C. s. 922(g); 18 U.S.C. s. 924(c) | Poss. of a Controlled Substance with Intent to Distribute; Felon in Poss. of a Firearm; Poss. of a Firearm in Furtherance of a Drug Trafficking Crime |

The application is based on these facts:

See attached affidavit from ATF Special Agent Belinda Perez

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Belinda Perez, ATF Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11/15/2019

*Judge's signature*

City and state: San Diego, California      Hon. Andrew G. Schopler, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| IN THE MATTER OF THE SEARCH OF<br><br>Samsung Galaxy J3 Prime Cellular Telephone<br>Serial #: R28K723RZ2L<br>IMEI #: 359479091705197 | **AFFIDAVIT OF SPECIAL AGENT BELINDA PEREZ IN SUPPORT OF SEARCH WARRANT** |
|---|---|

I, Special Agent Belinda Perez with the Bureau of Alcohol Tobacco Firearms and Explosives ("ATF") being duly sworn, hereby state as follows:

# I

# INTRODUCTION

1. This affidavit supports an application for a warrant to search the following:

   a. A Samsung Galaxy J3 Prime Cellular Telephone with Serial #: R28K723RZ2L and IMEI #: 359479091705197 (**Target Device #1**)

   b. A Samsung Galaxy Note 8 Cellular Telephone stored as ATF evidence item #08 (**Target Device #2**).

(collectively, the **Target Devices**) and seize evidence of crimes, specifically, violations of Title 21, United States Code ("U.S.C."), Section 841 – Possession of Methamphetamine with Intent to Distribute and Title 18, U.S.C., Sec. 924(c)(1) – possession of a firearm in furtherance of a drug trafficking crime, and Title 18 U.S.C. Sec. 922(g) – felon in possession of a firearm. This search supports an investigation and prosecution of Michael Henry DOUGLAS for the crimes mentioned above. A factual explanation supporting probable cause follows.

2. The **Target Devices** were seized on October 30, 2018 from DOUGLAS when he was arrested by officers from the Chula Vista Police Department ("CVPD"). The **Target Devices** are currently stored as evidence at the Bureau of Alcohol, Tobacco, Firearms and

Explosives ("ATF") San Diego IV Field Office vault located at 5901 Priestly Drive, Suite 304, Carlsbad, CA 92008.

3. Based on the information below, there is probable cause to believe that a search of the **Target Devices** will produce evidence of the aforementioned crimes, as described in Attachment B.

4. The information contained in this affidavit is based upon my experience and training, and consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from my review of documents and other evidence related to this case. Because this affidavit is made for the limited purpose of obtaining search warrants for the **Target Devices**, it does not contain all of the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish requisite probable cause.

## II
## AFFIANT'S EXPERIENCE AND TRAINING

5. I am a Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), United States Department of Justice, and have been so employed since May 2016. I am currently assigned to the San Diego IV, Field Office located in Carlsbad, California. I am a graduate of the Federal Law Enforcement Training Center and the ATF National Academy's Special Agent Basic Training Program. I am also a graduate of Texas State University, where I received a Master of Science degree in criminal justice and a graduate of Western Illinois University, where I received a Bachelor of Science degree in law enforcement and justice administration.

6. At the Federal Law Enforcement Training Center and the ATF National Academy in Glynco, Georgia, I received approximately 28 weeks of training. My training courses included but are not limited to, criminal law, constitutional law, and enforcement techniques such as undercover operations and search warrants. I learned how criminal enterprises are structured and how they operate. I also learned how controlled substances are manufactured, consumed, packaged, marketed, and distributed.

7. During my tenure as a Special Agent, I have received numerous hours of specialized training in the investigation and prosecution of firearm and drug-related crimes. I have participated in investigations involving the possession of firearms and illegal acquisition of firearms by both prohibited and non-prohibited persons. I have also participated in undercover operations involving firearms trafficking and the illegal distribution of controlled substances by individuals and criminal organizations. As a Special Agent, I have also performed various tasks which include but are not limited to the following:

   a. Functioning as a surveillance agent and thereby observing and recording the movements of individuals illegally trafficking weapons, persons trafficking controlled substances, and those suspected of committing violent crimes;

   b. Participating in tracing monies and assets gained by firearm and controlled substance traffickers from the illegal sale of firearms controlled substances;

   c. Investigating criminal street gangs and drug trafficking organizations and violent crimes related to their distribution of controlled substances and illegal weapons trafficking;

   d. Interviewing witnesses, cooperating individuals, and confidential informants relative to illegal activities including: violent acts, illegal trafficking of firearms and controlled substance, and the distribution of monies and assets derived from the illegal activity;

   e. Listening to intercepted telephone conversations between individuals where in their own words, have described their criminal activities.

8. Through the course of my training, investigations and conversations with other law enforcement personnel, I am aware that it is a common practice for individuals involved in the manufacturing and distribution of controlled substances to work in concert with other individuals and to do so by utilizing cellular telephones and other portable communication

3

devices to maintain communications with co-conspirators in order to further their illicit criminal activities. I am also aware that it is a common practice for individuals involved in the manufacturing and distribution of controlled substances to communicate with buyers regarding arrangements and payments utilizing cellular telephones. Based on my training and experience, I am aware that conspiracies involving the manufacture and distribution of controlled substances generate many types of evidence including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements and payment, names, photographs, text messages, and phone numbers of co-conspirators.

9. In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of drug trafficking and controlled substance manufacture and distribution investigations, and the opinions stated below are shared by them. Further, I am familiar with the facts outlined below, or I have read the reports of investigation prepared by persons mentioned in this Affidavit. Among other things, my knowledge comes from my personal analysis of the reports submitted by other law enforcement officers participating in this investigation to include that of the arresting officer.

10. Based upon my training and experience as an ATF SA, my participation in the investigation of narcotic organizations, and consultations with law enforcement officers experienced with narcotic trafficking, controlled substance manufacture and distribution, and money laundering investigations, and all the facts and opinions set forth in this Affidavit, I submit the following:

   a. Narcotics traffickers will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

   b. Narcotics traffickers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

   c. Narcotics traffickers and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

4

   d. Narcotics traffickers will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

   e. Narcotics traffickers will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

   f. Narcotics traffickers and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or narcotics proceeds.

   g. The use of cellular/mobile telephones by conspirators or narcotics traffickers tends to generate evidence that is stored on the cellular/mobile telephones, including, but not limited to emails, text messages, photographs, audio files, videos, call logs, address book entries, IP addresses, social network data, and location data.

11. Subscriber Identity Module ("SIM") Cards, also known as subscriber identity modules, are smart cards that store data for cellular/mobile telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a trafficker's use of a cellular/mobile telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

12. Based upon my training and experience, and consultations with law enforcement officers experienced in narcotics investigations, and all the facts and opinions set forth in this affidavit, I have learned know that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, based upon my training, education, and experience, I have learned that searches of cellular/mobile telephones associated with narcotics investigations yield evidence:

5

      a.      tending to identify attempts to possess methamphetamine, heroin, or other federally controlled substances with the intent to distribute them within the United States;

      b.      tending to identify other accounts, facilities, storage devices, and/or services – such as email addresses, IP addresses, and phone numbers – used to facilitate the possession of methamphetamine or other federally controlled substances with the intent to distribute them within the United States;

      c.      tending to identify co-conspirators, criminal associates, or others involved in the possession of methamphetamine or other federally controlled substances with the intent to distribute them within the United States;

      d.      tending to identify travel to or presence at locations involved in the possession of methamphetamine, heroin, or other federally controlled substances with the intent to distribute them within the United States, including stash houses, load houses, and/or delivery points;

      e.      tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

      f.      tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## III

## STATEMENT OF PROBABLE CAUSE

13.    On October 30, 2018 at approximately 8:45 a.m., Chula Vista Police Department Officer ("CVPD") Casey Rose, the Community Oriented Policing Project Coordinator, received an email from D. J., the manager of the Rodeway Inn located at 372 Broadway, Chula Vista, California. D.J. sent the email at about 8:29 a.m. to report that a bullet hole was found in the wall between Rooms 103 and 104. D.J. believed the bullet originated from Michael DOUGLAS in Room 104, and that DOUGLAS was still in room

104. After a phone call between Officer Rose and D.J., Officer Rose notified dispatch and officers responded to the scene.

14. Within minutes, officers arrived at the Rodeway Inn and spoke with J.G., the occupant of Room 103. J.G. told officers that he was sleeping in his room when, at about 3:00 a.m., he was awoken by a loud noise like a gunshot. J.G. went back to sleep. When he woke up that morning, however, J.G. noticed a bullet hole on the west wall of his room. This wall adjoins Room 104, DOUGLAS' room. Officers entered J.G.'s room and noticed a hole in the wall between rooms 103 and 104 that was consistent with the size of a bullet. Officers observed white powder and pieces of drywall on the floor, indicating recent damage. Officers also found a gunshot projectile on the ground.

15. After locating the bullet hole and projectile, officers determined that DOUGLAS was the occupant of Room 104, the adjacent room and apparent source of the gunshot. Officers requested that D.J. call DOUGLAS in Room 104 to request him to come outside. DOUGLAS answered the phone and complied. From a position of cover, officers drew their weapons, identified who they were, and directed DOUGLAS to a position of safety. Once DOUGLAS was on the ground, officers placed him in handcuffs.

16. Once DOUGLAS was safely detained, two officers approached the threshold of Room 104. The officers deployed Police Service Dog "Aries" inside the room as an initial "safety sweep" measure. Once officers called Aries back, officers entered Room 104 to conduct a safety sweep. Officers did not locate any other people during the sweep, but did locate the bullet hole between Room 104 and Room 103, and noticed the absence of any other bullet holes in any other walls. Officers also saw a box to a digital scale on the bed, in plain sight.

17. Once the safety sweep was complete, officers exited the room and sought a search warrant. Prior to seeking the search warrant, officers learned that DOUGLAS has an extensive criminal history, including narcotics and firearm offenses.

18. While waiting for the search warrant, DOUGLAS asked, "Is discharging a firearm in Chula Vista a Misdemeanor or Felony?" Officers told DOUGLAS that it was a

7

misdemeanor. DOUGLAS then asked if he could point at something in the room. DOUGLAS walked to the threshold of the room, pointed to a pillow on the bed, and told officers to lift the right side pillow. There, officers found a silver, loaded Smith & Wesson revolver. Officers placed DOUGLAS under arrest.

19. DOUGLAS was transported to the Chula Vista Police station where he waived his Miranda rights and elected to give a statement. DOUGLAS admitted to selling small portions of narcotics. DOUGLAS claimed that he did not remember shooting the gun, but that he remembered the gunshot noise, which woke him up. DOUGLAS said he purchased the gun about 2.5 years ago and that he keeps it for his protection.

20. The Honorable Judge Dwayne K. Moring authorized the search of Room 104 at approximately 1:47 p.m. During the subsequent search, officers and ATF agents found the loaded .38 caliber Smith & Wesson revolver, one clear plastic baggie in the trash can containing six clear plastic baggies with an approximate total of 3.56 grams of methamphetamine, numerous empty plastic baggies, 8-10 digital scales, and approximately $706 in U.S. currency. Law enforcement also found approximately 6.75 grams of heroin in a plastic bag under the sink. Law enforcement found **Target Device #1** on the bed of DOUGLAS' hotel room. **Target Device #2** was found from the desk under the TV, and was tagged as evidence item #08, where it remains.

21. Based on my training and experience, the quantity of methamphetamine and heroin seized, coupled with DOUGLAS' possession of the loaded firearm, along with the indicia of sales to include the digital scale, lead me to opine that he is very likely involved in the illicit, street level, retail distribution of methamphetamine and heroin.

22. Finally, I have learned that narcotics trafficking activities entail intricate planning to successfully evade detection by law enforcement. In my professional training, education and experience, I have learned that this requires planning and coordination in the days, weeks, and often months prior to the event. My training and experience leads me to believe that drug dealers use and rely upon cellular telephones/devices to converse, via both standard voice and by text message, in coordinating their drug related business and in the

consummation of larger, more complex drug transactions where multiple criminal parties are or may be involved. I believe the series of events surrounding DOUGLAS' arrest and the seizure of narcotics and indicia of sales described above are no exception. Accordingly, I believe that the **Target Devices** found in DOUGLAS' possession on his person, will provide additional evidence into the suspected drug trafficking activities of DOUGLAS and his specific involvement in the above-described instant offense. Given this, I request permission to search the **Target Devices** for items listed in Attachment B beginning on September 30, 2018, up to and including October 30, 2018.

## IV

## METHODOLOGY

23. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the

results using digital photography. This process is time and labor intensive and may take weeks or longer.

24. Following the issuance of this warrant, I will collect the **Target Devices** and subject them to analysis. All forensic analysis of the data contained within **Target Devices** and its memory card(s) will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

25. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or even months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

# V

# CONCLUSION

26. Based on all of the facts and circumstances described above, there is probable cause to conclude that DOUGLAS used the **Target Devices** to facilitate violations of Title 21, U.S.C., Section 841(a)(1), Title 18, U.S.C., Section 924(c)(1), and Title 18, U.S.C., Section 922(g).

27. Because the **Target Devices** was promptly seized during the investigation of DOUGLAS' distribution activities and has since been securely stored, there is probable cause to believe that evidence of illegal activities committed by DOUGLAS continues to exist on the **Target Devices**. As stated above, I believe that the date range for this search is from September 30, 2018 up to and including October 30, 2018.

28. WHEREFORE, I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the items described in Attachment A, and the seizure of items listed in Attachment B, using the methodology described above.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Belinda Perez
ATF Special Agent

SUBSCRIBED AND SWORN TO ME BEFORE THIS 15th DAY OF NOVEMBER 2019.

_____
HONORABLE ANDREW G. SCHOPLER
UNITED STATES MAGISTRATE JUDGE

11

## **ATTACHMENT A-2**

## **PROPERTY TO BE SEARCHED**

The property to be searched:

Samsung Galaxy Note 8 Cellular Telephone stored as ATF evidence item #08 ("**Target Device**").

The **Target Device** is currently in the possession of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") San Diego IV Field Office located at 5901 Priestly Drive, Suite 304, Carlsbad, CA 92008.

## ATTACHMENT B
## ITEMS TO BE SEIZED

Authorization to search the **Target Device** described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the **Target Device** for evidence described below. The seizure and search of the **Target Device** shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from the **Target Device** will be electronic records, contact lists, communications, and data such as emails, text messages, chats, and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of September 30, 2018 to October 30, 2018:

a. tending to identify attempts to possess firearms or methamphetamine, heroin, or other federally controlled substances with the intent to distribute them within the United States;

b. tending to identify other accounts, facilities, storage devices, and/or services – such as email addresses, IP addresses, and phone numbers – used to facilitate the possession of methamphetamine, heroin, or other federally controlled substances with the intent to distribute them within the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in the possession of methamphetamine, heroin, or other federally controlled substances with the intent to distribute them within the United States;

d. tending to identify travel to or presence at locations involved in the possession of methamphetamine, heroin, or other federally controlled substances with the intent to distribute them within the United States, including stash houses, load houses, and/or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

**which are evidence of violations of Title 21, United States Code, Section 841(a)(1), Title 18, United States Code, Section 924(c)(1) and Title 18, United States Code, Section 922(g).**